IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

FABIAN RODRIGUEZ,

    Petitioner,                          No. CIV S-09-3205 GEB DAD P

    vs.

M. MARTEL,

    Respondent.                      <u>FINDINGS & RECOMMENDATIONS</u>

        Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges a judgment of conviction entered against him on September 20, 2007 in the Sacramento County Superior Court on charges of second degree murder with the use of a knife. He seeks federal habeas relief on the grounds that his federal constitutional rights were violated by the admission into evidence of his statements to police. Upon careful consideration of the record and the applicable law, the undersigned will recommend that petitioner's application for habeas corpus relief be denied.

/////

/////

/////

/////

PROCEDURAL AND FACTUAL BACKGROUND

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal[1], the California Court of Appeal for the Third Appellate District provided the following procedural and factual summary:

> Defendant Fabian Rodriguez was found guilty by a jury of second degree murder and was found to have personally used a dangerous or deadly weapon in the commission of the offense. Defendant was sentenced to state prison for a term of 15 years to life, with a consecutive term of one year for use of a dangerous or deadly weapon.
>
> Defendant appeals, contending his confession was taken in violation of Miranda v. Arizona (1966) 384 U.S. 436 [16 L. Ed.2d 694] (Miranda) and was not voluntary. We shall affirm.
>
> FACTUAL BACKGROUND
>
> The victim and his cousin allowed defendant to stay at their apartment for a few days after he reported he had been "kicked out" of his residence. Two days later, when the cousin returned to the apartment after staying with his girlfriend, he found defendant and the victim angry at each other and very drunk. The cousin took the keys to the apartment from defendant and told the victim that it was his responsibility to tell defendant "that he needs to get out." The cousin went to his girlfriend's house, and when he returned the following morning, he found the victim dead in a bedroom. Defendant was arrested several days later.
>
> Defendant was interviewed by Sheriff's Detective Kenneth Clark, with the assistance of another detective (Detective Salvador Robles) to provide English-Spanish translation. A third detective (Detective Grant Stomsvik) was also present. Defendant was shackled during the first portion of the interview.
>
> Detective Kenneth Clark began by obtaining some background information from defendant. He then asked defendant if he was thirsty and, when defendant said he was, the detectives left and returned with a cup of water. Detective Clark asked some additional background questions, during which defendant disclosed that he had a second grade education and did not know what month he was born. Later in the interview, defendant divulged that he did not know how to write.

/////

---

[1] Notice of Lodging Documents on March 9, 2010 (Doc. Nos. 16, 17), Resp't's Lod. Doc. 4 (hereinafter Opinion), at 2-8.

Defendant was asked how he felt, and he replied, "normal." He said he slept the night before and ate the previous morning. He said he was not under a doctor's care, took no medications or illegal drugs and had not had any alcohol for several days. Then, the following exchange took place:

"DET[ECTIVE] CLARK:  Okay.  Okay.  Tell him I'm gonna, uh-uh, read him his Miranda.

"DET[ECTIVE] ROBLES [in Spanish]:  He's going – he's going to read you your Miranda rights, okay?

"[DEFENDANT]:  Uh-huh.

"DET[ECTIVE] CLARK:  And we just translate verbatim.  You have the right to remain silent.

"DET[ECTIVE] ROBLES [in Spanish]:  You have the right not to say anything.

"DET[ECTIVE] CLARK:  Do you understand?

"DET[ECTIVE] ROBLES [in Spanish]:  Do you understand that?

"[DEFENDANT]: What do you mean?[2]

"DE[TECTIVE] ROBLES [in Spanish]:  That you have the right not to say anything.

"[DEFENDANT] [in Spanish]:  Yes.

"DET[ECTIVE] ROBLES [in Spanish]:  Do you understand that?

"DET[ECTIVE] ROBLES [in English to Detective Clark]:  Yes.

"DET[ECTIVE] CLARK:  Anything you say may be used against you in court.

"DET[ECTIVE] ROBLES [in Spanish]:  Any – anything that you say can be used against you in a court of law.  Do you understand that?

"[DEFENDANT]:  Uh-huh.

"DET[ECTIVE] ROBLES [in English to Detective Clark]:  Yes.

"DET[ECTIVE] CLARK:  You have the right to the presence of an attorney before and during any questioning.  Do you understand?

---

[2] The response in Spanish was "Como?"

3

1   "DET[ECTIVE] ROBLES [in Spanish]: You have the right to have an attorney present before and during any questioning. Do you understand that?

2

3   "[DEFENDANT]: Uh-huh.

4   "DET[ECTIVE] CLARK: If you cannot afford an attorney one will be appointed for you free of charge before any questioning if you want.

5

6   "DET[ECTIVE] ROBLES [in Spanish]: If you can't pay an attorney one will be named for free to – to – to represent you before and during any questioning. Do you understand that?

7

8   "[DEFENDANT]: Uh-huh.

9   "DET[ECTIVE] ROBLES [in Spanish]: Yes or no?

10  "[DEFENDANT] [in Spanish]: Yes.

11  "DET[ECTIVE] ROBLES [in English to Detective Clark]: Yes.

12  "DET[ECTIVE] CLARK: And, uh, if you could read him the, uh, – and also if you could advise (inaudible) –

13

14  "DET[ECTIVE] ROBLES [in Spanish]: I'm also going to read this to you, okay?

15  "[DEFENDANT]: Uh-huh.

16  "DET[ECTIVE] ROBLES [in Spanish]: Since you are not, uh, a citizen of the United States and you have been detained to – detained or arrested you have the right to have us inform the representatives of the consulate of your country here in the United States of it. In some cases and depending on your nationality we are not required to contact the officials of the consulate of your country. Do you want us to notify the officials of the consulate of your country, yes or no?

17

18

19

20

21  "[DEFENDANT] [in Spanish]: With the officials or –

22  "DET[ECTIVE] ROBLES [in Spanish]: Consulate of your country? Yes or no?

23  "[DEFENDANT]: What do you mean?

24  "DET[ECTIVE] ROBLES [in Spanish]: The Mexican Consulate that you are detained or arrested.

25

    "[DEFENDANT]: No.
26  /////

4

1     "DET[ECTIVE] ROBLES:  No?

2     "[DEFENDANT]:  No.

3     "DET[ECTIVE] ROBLES [in English to Detective Clark]:  Okay, he said no so –

4

5     "DET[ECTIVE] STOMSVIK:  Okay.

6     "DET[ECTIVE] CLARK:  Tell him we'd like to talk to him about some of the things that [have] been going on the last few days.

7     "DET[ECTIVE] ROBLES [in Spanish]:  They want to talk about the things that have happened the last few days?

8

9     "[DEFENDANT]:  Uh-huh.

10     "DET[ECTIVE] ROBLES [in English to Detective Clark]:  Okay.

11     "DET[ECTIVE] CLARK:  Uh, –

12     "DET[ECTIVE] STOMSVIK:  Can – can I just butt in for a second?

13     "DET[ECTIVE] CLARK:  Yeah.

14     "DET[ECTIVE] STOMSVIK:  Uh, he waived Miranda.  Correct?

15     "DET[ECTIVE] ROBLES:  Yes.  Waived Miranda.

16     "DET[ECTIVE] STOMSVIK:  And then he said no to –

17     "DET[ECTIVE] ROBLES:  To this.  To the, uh, consular notification.

18

19     "DET[ECTIVE] STOMSVIK: Which means he waives or doesn't waive or –

20     "DET[ECTIVE] ROBLES:  He – he doesn't want us to contact them."

21

22 Following this exchange, some additional background information was elicited, during which defendant revealed that he had been in the United States "[f]our to five months" and that he lived with his uncle when he first arrived.  Detective Robles then asked defendant who he lived with after his uncle, and defendant replied, "with the guy that – I was with."  He described the individual and, eventually, explained "[t]here were three of us."  According to a transcript of the interview, the following exchange ensued:

23

24

25

26 /////

1    DET[ECTIVE] CLARK:  Who's the other guy?[3]

2    "[DEFENDANT] [in Spanish]:  No, I don't – know the other guy.

3    "[DEFENDANT] [in Spanish]: He was the one that – he was the one that – what's it called?  The one that I –

4    "DET[ECTIVE] ROBLES:  It's the one I – I murdered.[4]

5    "DET[ECTIVE] CLARK:  The guy that he murdered is the one [who] was living with him?

6    "DET[ECTIVE] ROBLES [in Spanish to defendant]:  The guy [who] you murdered is the one you were living ( sic )?

7    "[DEFENDANT]:  Mm, uh-huh.

8    "DET[ECTIVE] ROBLES [in English to Detective Clark]:  Yes.

9    "[DEFENDANT]:  Yes, well, there were three of us but – it was the other guy that – yes."

Defendant was asked what happened, and he explained that they had been drinking and he and the victim argued after the victim accused him of taking mail out of the mailbox.  Eventually, defendant grabbed a knife and stabbed the victim in the chest.

Prior to trial, defendant moved to suppress his statements, contending they were involuntary and were taken in violation of Miranda.  After viewing the videotaped confession and finding it "clear . . . that [defendant] understood what was being said," the trial court ruled that defendant entered a valid implied waiver when he began answering questions without exercising his rights.

## ANALYSIS

I. Standards of Review Applicable to Habeas Corpus Claims

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts.  See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v.

---

[3] This question and defendant's response were translated verbatim into Spanish and English, respectively, by Detective Robles.

[4] Detective Robles testified at trial that defendant stated, "el otro, que asesine," which literally translates as "the one I assassinated," and that the transcript of the interview was mistaken in failing to reflect defendant spoke these words prior to the detective's translation.

6

Isaac, 456 U.S. 107, 119 (1982)).  A federal writ is not available for alleged error in the interpretation or application of state law.  See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085.  Habeas corpus cannot be utilized to try state issues de novo.  Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003).  Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).  If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing court must conduct a de novo review of a habeas petitioner's claims.  Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008).  See also Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

The court looks to the last reasoned state court decision as the basis for the state court judgment.  Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  See also Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005) ("When more than one state court has adjudicated

a claim, we analyze the last reasoned decision"). If the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, this court may consider both decisions to ascertain the reasoning of the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003); <u>Pirtle v. Morgan</u>, 313 F.3d 1160, 1167 (9th Cir. 2002). When it is clear that a state court has not reached the merits of a petitioner's claim the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. <u>Nulph v. Cook</u>, 333 F.3d 1052, 1056 (9th Cir. 2003).

II. <u>Petitioner's Claim</u>

Petitioner's sole claim of entitlement to federal habeas relief is that his statements to police should have been suppressed at his trial because they were "obtained involuntarily and without a valid waiver of his <u>Miranda</u> rights." (Pet. at 4.) Petitioner argues that the admission of these statements into evidence at his trial violated "his rights to due process, to counsel, and his privilege against self-incrimination under the Fifth, Sixth, and Fourteenth amendments to the federal Constitution." (<u>Id.</u> at 11.)

Petitioner points out that he was "never asked whether he wished to waive his right to counsel or against self-incrimination and never did so." (<u>Id.</u> at 11, 17.) He denies that he impliedly waived his constitutional rights by continuing to speak to investigators after his rights were explained to him. (<u>Id.</u> at 10.) Petitioner notes that he did not speak English, was illiterate and unsophisticated, and did not know his exact birthday. (<u>Id.</u> at 29.) He argues that his answers to the interrogating deputy's questions reflect that he did not understand what he was being told by the officers. (<u>Id.</u>)

Petitioner also argues that his statements to law enforcement were involuntary "as a result of his lack of understanding of his rights and the significance of the admonitions

8

concerning them as well as the coercive tactics of the investigators." (Id. at 11.) Petitioner states that he was "questioned mostly while shackled to a chair;" that he had "as little sophistication as is imaginable;" that he was "in a weakened state," and that he had "not eaten in more than 24 hours and is provided food only after his confession." (Id. at 24, 28-29.) He claims that "the prosecution did not prove [petitioner's] statements were made after a knowing and intelligent waiver of his right to refuse to make them and thus should not have been admitted for any purpose." (Id. at 30.)

The record before this court reflects that a videotape of petitioner's police interrogation was played for the jury at petitioner's trial. (Reporter's Transcript on Appeal (RT) at 147, 150.) The jury was also given a written transcript which had an English translation of the Spanish language portion of that interview. (Id. at 147-49.) Petitioner testified at his trial that he ingested drugs and alcohol at the victim's apartment on the day of the crime, that he fell asleep that night, and that he woke up the next morning outside of the apartment. (Id. at 222-29.) The next day he went to a store to buy some food and the butcher told him the police were looking for him because he had stabbed the victim. (Id. at 230-32.) Petitioner testified that he didn't know whether he killed the victim or not, but he told the police that he did because he assumed they had conclusive evidence against him. (Id. at 234-35.)

The California Court of Appeal rejected petitioner's arguments that the admission into evidence of his statements to police was improper, reasoning as follows:

> On appeal, defendant reasserts that his confession was involuntary and was obtained in violation of Miranda.[5] We disagree.
>
> In Miranda, the United States Supreme Court held that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the

---

[5] Although the People assert that defendant has forfeited the question of whether his confession was involuntary by failing to obtain a ruling on this issue in the trial court, we deem the issue adequately raised in defendant's written motion, as well as being sufficiently intertwined with the Miranda issue to warrant review.

defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." (Miranda, supra, 384 U.S. at p. 444 [16 L.Ed.2d at p. 706].) A person subjected to custodial interrogation must be given warnings apprising him that he has the right to remain silent, that any statement he makes can be used against him, and that he has the right to retained or appointed counsel. (Id. at pp. 444-445 [16 L.Ed.2d at pp. 706-707].) A statement obtained in violation of Miranda is inadmissible to establish guilt. (People v. Sims (1993) 5 Cal.4th 405, 440.)

We examine two questions in determining the validity of a Miranda waiver: was the relinquishment of the right voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception; and was it made with full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. (People v. Whitson (1998) 17 Cal.4th 229, 247.) These questions are examined based on a totality of the circumstances – including the background, experience, and conduct of the defendant – to ascertain whether the defendant in fact knowingly and voluntarily decided to forgo his rights. (Id. at pp. 246, 247.) The validity of the waiver must be established by a preponderance of the evidence. (Id. at p. 248.)

Numerous cases have held that an express waiver of Miranda rights is not necessary, and that a willingness to answer questions after affirming an understanding of the Miranda rights can constitute a valid implied waiver. (People v. Cruz (2008) 44 Cal .4th 636, 667-668; People v. Whitson, supra, 17 Cal.4th at pp. 247-248, and cases cited therein.) "The question is not one of form, but rather whether the defendant in fact knowingly and voluntarily waived the rights delineated in the Miranda case. As was unequivocally said in Miranda, mere silence is not enough. That does not mean that the defendant's silence, coupled with an understanding of his rights and a course of conduct indicating waiver, may never support a conclusion that a defendant has waived his rights." (North Carolina v. Butler (1979) 441 U.S. 369, 373 [60 L.Ed.2d 286, 292].)

On review of a Miranda claim, we accept the trial court's resolution of disputed facts and inferences, and its evaluation of credibility, if supported by substantial evidence, and independently determine whether, from the undisputed facts and those properly found by the trial court, if the challenged statements were illegally obtained, although we give great weight to the considered conclusions of the trial court. (People v. Whitson, supra, 17 Cal.4th at p. 248.)

Here, defendant was advised of his Miranda rights and stated he understood each of them. Following this, defendant was informed

10

that the detectives wanted to talk to him about "the things that have happened the last few days," to which he responded affirmatively. There is no indication that defendant's judgment was clouded in any way – his answers to questions were responsive, reflecting no confusion or lack of comprehension. Nor is there any evidence that defendant lacked sufficient intelligence to understand his rights or the consequences of his waiver, despite his minimal education and purported illiteracy.

Regarding the voluntariness of the waiver, a review of the videotaped interview corroborates the absence of any coercive tactics. There was no physical or psychological pressure placed on defendant, and no threats or promises made to him, to induce him to talk to the detectives. The detectives were polite toward defendant, their tone cordial and friendly. When defendant expressed he was thirsty, he was brought water. He manifested no hesitation or uncertainty during questioning about whether he wanted to speak to the detectives. In sum, our review of the taped interview reveals nothing in the detectives' treatment of defendant or his response to them to indicate that he was intimidated or worn down in any way by improper interrogation tactics, lengthy questioning, or anything else.

Acknowledging that a <u>Miranda</u> waiver may be implied when a defendant answers questions after being advised of his rights, defendant contends a waiver cannot be implied under the circumstances here. He points out that he "was questioned while shackled to a chair" and claims he was "in a depleted state" because he was "deprived of food." He also relies on the fact that he is from a small town rather than a "sophisticated background," speaks no English and is illiterate, in arguing that he is "precisely the kind of person who would not be able to give a truly knowing and intelligent waiver of his right to remain silent."

Again, a review of the videotaped interview dispels these claims. Defendant does not appear weakened or particularly naive. Nor is his demeanor that of someone who is immature or intimidated. Defendant's lack of education does not necessarily equate to low intelligence, and he appears to be of average intellect, as reflected by his comprehension and responsiveness to questions. Contrary to defendant's assertion, it is evident from his responses and his behavior that he willingly participated in the interview.

Defendant claims his lack of understanding was demonstrated by his response when asked if he understood after being advised of his right to remain silent. Our review of the videotaped interview convinces us that defendant's response did not evince a lack of comprehension of the right described but was merely a request regarding what in particular the detective was referring to when he asked if defendant understood. Defendant did not hesitate to answer affirmatively, manifesting his understanding, when the

11

    detective repeated "that you have the right not to say anything." Defendant's response was not ambiguous, nor is a "single response, in isolation, controlling on the question whether defendant made a knowing and voluntary waiver of his Miranda rights under the totality of the circumstances surrounding his interrogation." (People v. Cruz, supra, 44 Cal.4th at p. 668.)

    As the evidence supports the trial court's conclusion that defendant made an implied waiver of his Miranda rights, and as there is no evidence that defendant's "'will was overborne'" at the time he confessed (People v. Cruz, supra, 44 Cal.4th at p. 669), his claims that his confession was involuntary and violated Miranda are rejected.

DISPOSITION

    The judgment is affirmed.

(Opinion at 8-13.)

        In Miranda, the United States Supreme Court held that "[t]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. at 444. To this end, custodial interrogation must be preceded by advice to the potential defendant that he or she has the right to consult with a lawyer, the right to remain silent and that anything stated can be used in evidence against him or her. Id. at 473-74. These procedural requirements are designed "to protect people against the coercive nature of custodial interrogations." DeWeaver v. Runnels, 556 F.3d 995, 1000 (9th Cir. 2009). Once Miranda warnings have been given, if a suspect makes a clear and unambiguous statement invoking his constitutional rights, "all questioning must cease." Smith v. Illinois 469 U.S. 91, 98 (1984). See also Miranda, 384 U.S. at 473-74; Michigan v. Mosley, 423 U.S. 96, 100 (1975); DeWeaver v. Runnels, 556 F.3d at 1001.

        A defendant may waive his Miranda rights, provided the waiver is "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception," and "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421

12

(1986). However, an express waiver of Miranda rights is not necessary. Berghuis v. Thompkins, ___ U.S. ___, ___, 130 S. Ct. 2250, 2261 (2010); North Carolina v. Butler, 441 U.S. 369, 373 (1979); United States v. Younger, 398 F.3d 1179, 1185 (9th Cir. 2005) ("In soliciting a waiver of Miranda rights, police officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or her rights"). A valid waiver of rights may be implied under the circumstances presented in the particular case. Specifically, "a suspect may impliedly waive the rights by answering an officer's questions after receiving Miranda warnings." United States v. Rodriguez, 518 F.3d 1072, 1080 (9th Cir. 2008) (quoting United States v. Rodriguez-Preciado, 399 F.3d 1118, 1127, amended, 416 F.3d 939 (9th Cir. 2005)). See also Butler, 441 U.S. at 369-73 (waiver of Miranda rights can be inferred "from the actions and words of the person interrogated.").

The Fourteenth Amendment to the United States Constitution demands that confessions be made voluntarily. See Lego v. Twomey, 404 U.S. 477, 483-85 (1972). A confession is voluntary only if it is "'the product of a rational intellect and a free will.'" Medeiros v. Shimoda, 889 F.2d 819, 823 (9th Cir. 1989) (quoting Townsend v. Sain, 372 U.S. 293, 307 (1963)). See also Blackburn v. Alabama, 361 U.S. 199, 208 (1960). An admission is involuntary "if coerced either by physical intimidation or psychological pressure." Mickey v. Ayers, 606 F.3d 1223, 1233 (9th Cir. 2010) (citing United States v. Shi, 525 F.3d 709, 730 (9th Cir. 2008)). In determining whether a confession is voluntary, a court "examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession" Dickerson v. United States, 530 U.S. 428, 434 (2000). "The line of distinction is that at which governing self-direction is lost and compulsion, of whatever nature or however infused, propels or helps to propel the confession." Collazo v. Estelle, 940 F.2d 411, 416 (9th Cir. 1991) (en banc) (quoting Culombe v. Connecticut, 367 U.S. 568, 602 (1961)). "Coercive police activity is a necessary predicate to finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." Colorado v. Connelly, 479 U.S. 157, 167

1  (1986).  Voluntariness is to be determined in light of the totality of the circumstances.  Miller v.
2  Fenton, 474 U.S. 104, 112 (1985); Haynes v. Washington, 373 U.S. 503, 513 (1963).

3  This court has reviewed the video recording of petitioner's interrogation.  After
4  review, the court agrees with the conclusions reached by the California Court of Appeal.
5  Petitioner waived his Miranda rights at the commencement of the interrogation when, after
6  receiving the appropriate warnings and being told the officers wanted to talk to him about the
7  events of the last few days, petitioner stated that he understood those warnings and began to
8  answer the officer's questions without hesitation or objection.  See Berghuis, 130 S. Ct. at 2261
9  (noting that a waiver of Miranda rights may be implied through the defendant's silence, along
10 with an understanding of those rights and a course of conduct indicating waiver) (citing Butler,
11 441 U.S. at 373).  There is nothing in the responses given by petitioner in response to the
12 officers' Miranda warning or otherwise to indicate that he did not understand his constitutional
13 rights as explained to him or that he wished to invoke his rights to counsel and to remain silent.
14 Further, as noted by the California Court of Appeal, petitioner appeared to understand all of the
15 officers' questions and his answers were coherent and intelligible, notwithstanding his lack of
16 education.  There is also no evidence before this court that petitioner's statements were coerced
17 or involuntary.  The videotape of the interrogation shows that petitioner was offered water at the
18 beginning of the interview and again at the end of the interview.  Although he stated he had not
19 eaten since the previous day, he did not appear weak or tired.  As stated by the state appellate
20 court, a review of the taped interrogation "reveals nothing in the detectives' treatment of
21 [petitioner] or his response to them to indicate that he was intimidated or worn down in any way
22 by improper interrogation tactics, lengthy questioning, or anything else."  (Opinion at 11.)  There
23 is certainly no evidence that petitioner's will was overborne by the circumstances surrounding or
24 the conduct of the interrogation.

25  The decision of the California Court of Appeal that petitioner waived his right to
26 remain silent and to the presence of an attorney, and that his statements to police were not

14

involuntary, is not contrary to or an unreasonable application of federal law as set forth above. Accordingly, petitioner is not entitled to federal habeas relief on his sole claim.

## CONCLUSION

Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  Failure to file objections within the specified time may waive the right to appeal the District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  See Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED: February 4, 2011.

_____
DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:8
rodriguez3205.hc